*JUDGE HOLWELL*  

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

THE LEVIN GROUP, L.P.,

          Plaintiff,

      v.

BOWATER INCORPORATED,

          Defendant.

**Civil Action No. 07**

**NOTICE OF REMOVAL**

JUL 1 8 2007

U.S.... ..... N.Y.
CASII...S

      PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, defendant Bowater Incorporated ("Defendant") removes the above-entitled action, and all claims and causes of action therein, currently pending in the Supreme Court of New York, New York County (the "State Court Action"), and state:

      1.    Plaintiff The Levin Group, L.P. ("Plaintiff"), filed the above-entitled action on or about June 18, 2007 in the Supreme Court of New York, New York County. The Complaint is premised on alleged breach of contract and fraudulent inducement by the Defendant and related equitable theories and seeks damages and declaratory relief.

      2.    This notice is being filed within 30 days of receipt by the Defendant of the Complaint and thus is timely filed under 28 U.S.C. § 1446(b).

      3.    Removal to the United States District Court for the Southern District of New York is proper under 28 U.S.C. § 1441 because this is the district embracing the Supreme Court of New York, New York County, "the place where such action is pending." 28 U.S.C. § 1441(a).

      4.    Pursuant to 28 U.S.C. § 1446(d), the Defendant will file a copy of this Notice of Removal with the Clerk of the Supreme Court of New York, New York County, and will

mail a copy of this Notice of Removal to the Plaintiff to properly effect removal of this action to this Court.

5.    Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the summons and complaint which, upon information and belief, was filed to commence the State Court Action, is attached hereto as Exhibit A.

6.    As required by 28 U.S.C. § 1441(b), no citizen of the State of New York is a defendant in this action.

## DIVERSITY JURISDICTION OF THIS COURT

7.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because: (i) the matter in controversy exceeds the sum or value of $75,000; and (ii) the action is between citizens of different states.

### Amount In Controversy

8.    Plaintiff seeks damages of "no less than $70 million," an amount in excess of the jurisdictional minimum of $75,000.  See Complaint ¶ 34.

### Diversity Of Citizenship Between The Parties

9.    Plaintiff is a partnership with a principal place of busines in the State of New York.  See Complaint at ¶ 2.

10.    Defendant is a corporation formed under the laws of the State of Delaware and has its principal place of business in the State of South Carolina.  See Complaint ¶ 3. Defendant is therefore a citizen of the States of Delaware and South Carolina pursuant to 28 U.S.C. § 1332(c)(1).

2

11.    Plaintiff is a limited partnership.    The citizenship of a partnership is determined by the citizenship of its partners, not its State of organization.    See *Carden* v. *Arkoma Associates*, 494 U.S. 185, 189, 195-96 (1990).

12.    On information and belief, each of Plaintiff's general and limited partners is a resident of the State of New York.

13.    On information and belief, none of Plaintiff's general or limited partners is a resident of the States of South Carolina or Delaware.

14.    Accordingly, because this action is between citizens of different states, and because Plaintiff seeks damages in excess of the jurisdictional minimum of $75,000, this Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1332(a)(1).

## RESERVATION OF RIGHTS

15.    By filing this Notice of Removal, the Defendant intends to waive no rights including (by way of illustration only) the right to assert the defenses of inadequate service of process and lack of personal jurisdiction, all such rights being expressly reserved.

WHEREFORE, the Defendant hereby removes this action to this Court from the Supreme Court of New York, New York County.

Dated: New York, New York
        July 18, 2007

MAYER, BROWN, ROWE & MAW LLP

By: _____
    Andrew H. Schapiro
    1675 Broadway
    New York, New York 10019
    (212) 506-3500

*Attorneys for Defendant*
*Bowater Incorporated*

4

# Exhibit   A

SUPREME COURT STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE LEVIN GROUP, L.P.,                                  :     Index No. *108447-2007*
                                                        :     *filed 6-18-07*
                                   Plaintiff,           :
                                                        :     **SUMMONS**
                                                        :
                                  -against-             :     Plaintiff designates New York County as
                                                        :     the place of trial.
                                                        :
                                                        :     The basis of the venue is Plaintiff's
BOWATER, INC.,                                          :     residence in this County.
                                                        :
                                   Defendant.           :          NEW YORK
                                                        :     COUNTY CLERK'S OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x          JUN 18 2007

TO:   Bowater, Inc.                                            NOT COMPARED
      55 East Camperdown Way                                   WITH COPY FILE
      Greenville, South Carolina 29602

        You are hereby summoned to answer the Complaint in this action and to serve a copy of
your answering papers on the Plaintiff's attorney within 20 days after the service of this
Summons, exclusive of the day of service (or within 30 days after the service is complete if this
Summons is not personally delivered to you within the State of New York); and in case of your
failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the Complaint.

Dated: New York, New York              DECHERT LLP
       June 18, 2007
                                       By: _____

                                           Guy Petrillo
                                           Neil A. Steiner
                                           Joshua I. Sherman

                                       30 Rockefeller Plaza
                                       New York, New York 10112
                                       (212) 698-3500

                                       *Counsel for Plaintiff The Levin Group, L.P.*

SUPREME COURT OF NEW YORK
NEW YORK COUNTY

-------------------------------------------------- x

THE LEVIN GROUP, L.P.,

    Plaintiff,

v.

BOWATER, INC.,

    Defendant.

-------------------------------------------------- x

No. *108441* ___ /07
*Filed -6-18-07*

NEW YORK
COUNTY CLERK'S OFFICE

**COMPLAINT**

JUN 18 2007

NOT COMPARED
WITH COPY FILE

Plaintiff The Levin Group, L.P. ("TLG"), by and through its counsel, Dechert LLP, for its

complaint against Defendant Bowater Incorporated ("Bowater" or the "Company"), alleges

based on knowledge as to its own conduct and information and belief as to the conduct of others,

as follows:

<u>**INTRODUCTION**</u>

1.    This action arises from Bowater's breach of contract, by its repudiation of its

obligation to pay TLG a transaction fee for the services TLG furnished to Bowater in connection

with the Company's planned merger with Abitibi-Consolidated Inc. ("Abitibi"), and its

fraudulent conduct in inducing TLG to provide transactional financial advisory services to the

Company.  Pursuant to an Engagement Agreement effective as of July 31, 2006 ("Engagement

Agreement"), Bowater's President and Chief Executive Officer, David Paterson ("CEO"), and

Chief Financial Officer, William G. Harvey ("CFO"), instructed TLG to dedicate its resources to

merger, acquisition and related divestiture analysis on behalf of the Company.  In accordance

with those instructions, TLG provided transactional advisory services to Bowater in connection

with the merger agreement with Abitibi ("Merger Agreement"), and, pursuant to the Engagement

Agreement, is entitled to be paid the Transaction Fee (as defined under the Engagement

Agreement (see ¶ 13)) upon the closing of the merger. TLG brings this action for damages of no less than $70 million and/or declaratory relief now, prior to closing of the Bowater/Abitibi merger, because Bowater, in bad faith and pursuant to a fraudulent plan to induce TLG to work under false pretenses, has communicated in writing by email and certified mail that it does not intend to make the required payment at closing.

## PARTIES

2.    Plaintiff TLG is a Delaware partnership with its principal place of business in New York, New York. TLG is a mergers and acquisition ("M&A") advisory firm which since its founding in 1991 has provided strategic and transactional financial advisory services to leading U.S. corporations and international clients in Europe, Mexico and Japan. TLG's founder and Managing Director, William Levin, is a graduate of Yale University (1978) (*summa cum laude*), Yale School of Management (1983) and Yale Law School (1986). Mr. Levin served as a law clerk to the Honorable James L. Buckley of the United States Court of Appeals for the District of Columbia Circuit in 1987, and thereafter worked as a Special Assistant in the Office of Legal Counsel, U.S. Department of Justice from 1987 through 1989. From 1989 to 1991, Mr. Levin was employed by Wasserstein, Perella & Co. ("Wasserstein Perella"), a New York-based investment banking firm.

3.    Defendant Bowater is a leading North American producer of newsprint and publication papers for magazines and catalogs, and is traded on The New York Stock Exchange under the ticker symbol BOW. Bowater is incorporated under the laws of Delaware and is headquartered at 55 East Camperdown Way, P.O. Box 1028, Greenville, South Carolina, 29602.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Bowater pursuant to C.P.L.R. § 301, because

Bowater does business in New York on a systematic and continuous basis, such that it is present

in New York.  This Court also has jurisdiction over Bowater pursuant to C.P.L.R. § 302 because

Bowater has transacted business within New York (including its business with TLG), and the

claims asserted herein arise from Bowater's business with TLG.

5.      Venue is proper in this County pursuant to C.P.L.R. §§ 503(a) and 509, because

Plaintiff resides in this County and because Plaintiff designates this County as the place of trial.

## FACTUAL ALLEGATIONS

6.      Mr. Levin has extensive experience providing M&A advisory services to the

forest products industry.  In the past three years, TLG has provided significant M&A advisory

services to 3 of the 8 largest forest products companies in North America.

7.      From 1989 to 1990, while Mr. Levin was employed by Wasserstein Perella, he

assisted in advising Georgia-Pacific Corporation ("Georgia-Pacific") in its $5 billion purchase of

Great Northern Nekoosa Corporation.  Thereafter, commencing in 1992, TLG, by Mr. Levin,

served regularly as a strategic and financial advisor to Georgia-Pacific until its acquisition by

Koch Industries in December 2005.  Among other matters, TLG provided extensive strategic

advisory services to Georgia-Pacific's building products business, which from 2003 to 2006, was

led by Mr. Paterson as its Executive Vice President.  TLG represented Georgia-Pacific in the sale

of its envelope business, roofing manufacturing business and short line railroads, and in its

strategic sourcing of poly plastics.  TLG provided extensive advisory services to Georgia-

Pacific's containerboard and packaging businesses.  TLG also provided advisory services to

Georgia-Pacific's consumer products business and pulp and paper business.

3

8.    Mr. Paterson joined Georgia-Pacific in 1987, and left in the spring of 2006 to become the President and Chief Executive Officer of Bowater. In a number of the above-described advisory services engagements, Mr. Levin worked extensively with Mr. Paterson during his tenure as Executive Vice President of building products for Georgia-Pacific. TLG's engagements for Georgia-Pacific, including those performed for Mr. Paterson's business unit, were performed pursuant to engagement agreements that provided for the payment to TLG of retainer fees plus transaction fees for consummated transactions. Mr. Paterson was familiar with the mergers and acquisitions advisory services provided by TLG and well aware of the financial terms of TLG's engagements.

9.    Recognizing the value added by TLG's advice and efforts on behalf of Georgia-Pacific, Mr. Paterson, when he became the CEO of Bowater, quickly turned to TLG and asked it – and specifically Mr. Levin – to serve in a similar strategic advisory role for Bowater. Upon taking the helm at Bowater, Mr. Paterson knew that to achieve success in his new position, he would need to reverse a sustained period of deteriorating performance at the Company, and sought Mr. Levin's commitment, strategic advice and assistance to accomplish this formidable task.

10.    TLG agreed to commit itself to Mr. Paterson's efforts. Accordingly, from approximately July 2006 through March 2007, TLG worked closely with Mr. Paterson and other members of the Company's senior management ("Management") to develop, evaluate and implement a strategy to maximize shareholder value at Bowater. In this period, Bowater assigned TLG to assist, and TLG worked in depth, in the evaluation and analysis concerning several proposed substantial corporate transactions, culminating, as described below, in TLG's extensive work in support of Bowater's negotiations and agreement with Abitibi. At all relevant

4

times during this period, TLG worked at the specific written and oral direction of Bowater Management.

11.    In October 2006, Bowater and TLG executed the Engagement Agreement, effective as of July 31, 2006. The Engagement Agreement provided that Bowater retained TLG "(i) to be a strategic and financial advisor to Bowater, and (2) to review certain potential acquisitions and divestitures as specifically identified by Bowater to TLG in writing as a transaction subject to Paragraph 2(b) below (such potential acquisitions and divestitures referred to herein individually as a "Transaction")."

12.    Paragraph 1 of the Engagement Agreement described the scope of services to be provided by TLG to Bowater in connection with a "Transaction." Under that paragraph, TLG, in its capacity as a strategic and financial advisor to Bowater, at the latter's request, agreed, if and as appropriate, to:

(a)    Familiarize itself with and conduct such financial review and evaluation of the Transaction, and its business, operations, properties, financial condition and prospects as Bowater and TLG shall mutually agree is desirable and feasible;

(b)    Review and advise on the strategic and financial alternatives available to Bowater in connection with the Transaction, including valuation, transaction structure, and due diligence review;

(c)    Assist in the negotiation of definitive agreements for the Transaction to the extent requested by Bowater;

(d)    Provide such other strategic and transactional financial advisory services related to the Transaction as may from time to time be agreed upon by the Bowater and TLG.

13.    The Engagement Agreement provided that TLG would be paid an advisory fee of $100,000 payable monthly from August 1, 2006 through January 31, 2007, plus "in the event of execution of definitive agreements and closing of a Transaction, a transaction fee equal to 2% of the enterprise value of the transaction, defined as the equity value plus assumed indebtedness (the "Transaction Fee")."

5

14.     In furtherance of TLG's efforts to assist Mr. Paterson and Management in evaluating potential corporate transactions that could serve to maximize shareholder value, TLG prepared a detailed analysis of Bowater based on publicly available data, analyzing in part whether Bowater in prior years had impaired shareholder value due to prices paid for historical acquisitions. Subsequent to this analysis, Bowater – through both Mr. Paterson and other members of Management – requested orally and in writing that TLG analyze and advise the Company with respect to a transaction proposed by a major coated-paper producer, "Company A."[1] Company A's proposal resulted in intensive and complex negotiations, requiring detailed analyses by TLG, which dedicated significant time and expertise to this process. In early October 2006, Bowater and Company A recognized that there were no mutually agreeable terms to pursue and terminated discussions.

15.     Mr. Paterson next directed TLG to evaluate and advise the Company with respect to two separate potential corporate transactions: (1) a sale of substantially all of the newsprint assets of Bowater to an independent, private newsprint producer, "Company B;"[2] and (2) a proposed merger with Abitibi. In connection with evaluating these potential transactions, Management directed TLG to analyze potential alternative transactions, including divestitures and multi-party transactions that ultimately were not pursued. At Management's direction, TLG also evaluated certain other potential transactions associated with completing one or more of the principal transactions under consideration, for example, certain divestitures in connection with

---

[1]     "Company A" is not identified by name herein because the proposed transaction did not eventuate.

[2]     Again, because the "Company B" negotiations did not lead to an agreement, it is not identified by name.

6

the transactions. In each case, TLG worked intensively and performed all services requested by the Company.

16.    In connection with the proposed merger with Abitibi, among other things, Bowater requested TLG to review and evaluate the Transaction, including matters related to valuation, transaction structure and due diligence, and advise on the strategic and financial alternatives available to Bowater in connection with the Transaction. TLG performed all of these and related services as requested by Bowater and to Bowater's satisfaction.

17.    TLG's advisory services were of particular importance to Mr. Paterson and Management in light of Management's view, at least through November 2006, that the Company had received inadequate advisory services from its other principal financial advisor at the time, as reflected in contemporaneous email correspondence authored by senior Management.

18.    With respect to the potential Abitibi merger, in addition to receiving written and other instructions from Management during the course of due diligence, transaction analyses and negotiations, on or about January 18, 2007, TLG received from Bowater corroborating written instructions that specifically identified in writing that TLG, on behalf of Bowater, was to review and advise on the Abitibi merger as part of TLG's Engagement Agreement. In particular, the Company forwarded to Mr. Levin a supplemental confidentiality agreement (the "Second Confidentiality Agreement"), executed by Mr. Harvey, the Company's CFO, on behalf of Bowater. The Second Confidentiality Agreement memorialized that "Bowater and Abitibi-Consolidated Inc. are currently involved in discussions relating to a possible strategic combination," (which were defined as the "Discussions") and specified that TLG had been retained by Bowater as its "Representative to assist Bowater in the Discussions." Bowater, through legal counsel representing it in connection with the Abitibi transaction, specifically

7

directed TLG to date the Second Confidentiality Agreement "as of the date The Levin Group was engaged by Bowater to assist with this transaction."

19.    With respect to its specific assignment in the Abitibi matter, TLG, through March 2007, participated in multiple meetings, performed detailed analyses of financial and other information pertaining to the Transaction, including analyses of potential synergies, divestitures, alternative financial terms and other material matters, advised on projections and due diligence, and, at the request of Management, reviewed and assessed the work of other advisors to the Company.

20.    In announcing the merger, Bowater identified TLG as one of its transactional financial advisors in connection with the transaction. Section 4.18 of the Merger Agreement, which is entitled "Brokers and Other Advisors," provided, in relevant part, as follows:

> No broker, investment banker, financial advisor or other person (other than Goldman, Sachs & Co., UBS Investment Bank and The Levin Group, L.P.) is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Bowater.

21.    From early January 2007 through mid-March 2007, Mr. Levin made several attempts to discuss payment of the Transaction Fee with Mr. Paterson, but Mr. Paterson stalled and avoided such discussion. At no time did Mr. Paterson tell Mr. Levin that he did not believe a Transaction Fee was owed to TLG or that Bowater did not intend to pay such a fee. Accordingly, TLG continued to perform all work requested of it throughout this period of time.

22.    In February and March 2007, Mr. Paterson and Management continued to solicit detailed suggestions from TLG related to post-merger integration analyses. Among other services, TLG proposed a detailed strategic model to analyze post-merger integration and transaction opportunities. Mr. Paterson directed Mr. Levin to pursue these plans, which resulted

8

in a lengthy conference call on February 10, 2007, with two senior members of Management, W. Eric Streed (Executive Vice President of Operations and Process Improvement) and David Spraley (Senior Vice President of Manufacturing). The call was followed by an in-depth, in-person review with Messrs. Streed and Spraley at Bowater headquarters on February 27, 2007.

23.     In a telephone call on March 19, 2007, Mr. Paterson abruptly notified Mr. Levin that TLG was not entitled to a Transaction Fee in connection with the Abitibi merger. Following the telephone call, Mr. Paterson instructed Mr. Levin to put a "[h]alt to any work" that TLG was performing on behalf of Bowater in connection with the Abitibi transaction. Mr. Paterson directed Mr. Levin to speak with Mr. Harvey regarding payment of the Transaction Fee.

24.     Shortly thereafter, Mr. Levin and Mr. Harvey spoke by telephone. At the conclusion of the call, Mr. Harvey said he would review the issue with Mr. Paterson the next day and get back to Mr. Levin promptly.

25.     Also on March 19, 2007, Abitibi and Bowater filed the Preliminary S-4, which detailed the fees to be paid to Bowater's other financial advisers. Specifically, the Preliminary S-4 disclosed that Goldman, Sachs & Co. was to receive a transaction fee of approximately $12 million (of which $3.2 million had already been paid), and UBS was to receive a transaction fee of approximately $8 million (of which $2 million had already been paid). The Preliminary S-4 made no mention of the fees payable or to be paid to TLG.

26.     On March 27, 2007, Ronald Lindsay ("Mr. Lindsay"), Bowater's Executive Vice President and General Counsel, sent a letter to TLG by email and certified mail indicating Bowater's position that TLG is not entitled to a Transaction Fee relating to the Company's merger with Abitibi. In the letter, Mr. Lindsay took the position, contrary to the plain language of the Engagement Agreement, that Bowater intended to pay a 2% transaction fee to TLG only in

9

connection with transactions having an enterprise value of $250 million or less. The transaction size "limitation" expressed by Mr. Lindsay was a *post hoc* invention and an admission that Bowater, to induce TLG to provide transaction advisory services requested by Bowater in connection with a number of transactions, had misled TLG into believing that it would be paid a transaction fee for performing work on assigned transactions regardless of size, even though Bowater did not intend to pay such a fee for transactions of greater than $250 million.

27.    On March 29, 2007, Mr. Harvey called Mr. Levin. In that discussion, among other statements, Mr. Harvey stated, in substance, that even with respect to transactions of less than $250 million, as to which Mr. Lindsay had maintained the Engagement Agreement was intended to apply, it had never been Bowater's intention, even when the Engagement Agreement was negotiated, to pay a 2% fee to TLG for a transaction. Mr. Harvey thus admitted a fraud in the inducement – in that he acknowledged that the Company never intended to adhere to the terms of the Engagement Agreement – and provided another example of Management's concoction of *post hoc* excuses to avoid its contractual and legal obligations.

28.    The above conduct and communications of Mr. Paterson, Mr. Harvey and Mr. Lindsey reflect that Management of the Company, in concert, deliberately concealed its intentions concerning payment of a Transaction Fee to TLG both (a) during the time that Bowater directed in multiple writings and discussions that TLG perform transaction advisory services in support of the Company's consideration of several proposed transactions, including the Abitibi merger (all of which directives TLG implemented), and (b) at the time that Bowater executed the Engagement Agreement.

29.    Bowater has expressly repudiated any intention to pay TLG the Transaction Fee owed to TLG for its services as a strategic and financial advisor to Bowater in connection with the merger.

### As And For A First Cause Of Action
### (Breach of Contract)

30.    TLG repeats and realleges each and every allegation of Paragraphs 1 through 29 of this Complaint as set forth herein.

31.    The Engagement Agreement is valid, binding and enforceable against Bowater.

32.    TLG fulfilled its obligations under the Engagement Agreement.

33.    Bowater has repudiated its material obligations under the Engagement Agreement by announcing its intention not to pay TLG the Transaction Fee in connection with the Bowater/Abitibi merger, as required by the Agreement.

34.    As a direct result of Bowater's material breaches, TLG has been damaged in a precise amount to be determined at trial and no less than $70 million.

### As And For A Second Cause Of Action
### (Declaratory Judgment)

35.    TLG repeats and realleges each and every allegation of Paragraphs 1 through 34 of this Complaint as set forth herein.

36.    A real and substantial controversy exists as to whether Bowater is required to pay TLG a transaction fee at the closing of its merger with Abitibi, such that it is a justiciable controversy under C.P.L.R. § 3001.

37.    Plaintiff has a substantive claim of right to be paid the Transaction Fee by Bowater at the closing of its merger with Abitibi.

38.    Plaintiff respectfully requests that the Court, pursuant to C.P.L.R. § 3001, render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to the justiciable controversy of whether Bowater owes TLG the Transaction Fee at the closing of its merger with Abitibi.

### As And For A Third Cause of Action
**(Fraud)**

39.    TLG repeats and realleges each and every allegation of Paragraphs 1 through 38 of this Complaint as set forth herein.

40.    In or around October 2006, Bowater, to induce TLG to perform transactional financial advisory services to the Company, intentionally made material misstatements of facts to TLG at the time the Engagement Agreement was entered into, to wit, that Bowater would pay a Transaction Fee in accordance with the Agreement in relation to closed transactions to which TLG had been expressly assigned by Bowater and provided services as a transactional financial advisor.

41.    Further, from in or about July 2006 through March 2007, Bowater engaged and expressly directed TLG to perform services as a transactional financial advisor to the Company in connection with transactions that, according to industry practice and custom well known to Bowater, involve the payment of transaction fees at closing to assigned financial advisors. During this time, Management intentionally concealed from TLG that it would not pay such customary fees in relation to the transactions to which it had expressly assigned TLG to perform transactional financial advisory services.

42.    Even after TLG raised the issue of the Transaction Fee with Bowater Management, Management delayed responding for many weeks to induce TLG to continue to perform transactional financial advisory services in relation to the Bowater/Abitibi merger.

12

43.    In agreeing to perform and in performing transactional financial advisory services for Bowater from in or about July 2006 through March 2007, TLG justifiably relied on Bowater to adhere to its written commitments and, in the absence of any express statement to the contrary, to conduct itself consistent with custom and practice in the transactional financial advisory services industry.

44.    TLG has suffered damages caused by Bowater's deceptive conduct, to wit, in connection with the transactional advisory services TLG provided to Bowater in relation to the Bowater/Abitibi merger transaction, the fair value of its services under the Engagement Agreement or in the alternative according to custom and practice in the transactional financial advisory industry.

<u>As And For A Fourth Cause Of Action</u>
**(Quantum Meruit)**

45.    TLG repeats and realleges each and every allegation of Paragraphs 1 through 44 of this Complaint as set forth herein.

46.    TLG conferred the benefit of its transactional financial advisory services to Bowater in connection with the Bowater/Abitibi merger.

47.    Bowater realized that benefit.

48.    By industry custom, when defined services, such as the transactional financial advisory services requested by Bowater and rendered by TLG, result in a transaction, the result is the payment of a transaction fee at the prevailing market rate.

49.    The circumstances under which Bowater realized the benefit of TLG's services, including industry custom, make it inequitable for Bowater to have utilized and benefited from such services without paying for their value.

13

### As And For A Fifth Cause Of Action
#### (Unjust Enrichment)

50.    TLG repeats and realleges each and every allegation of Paragraphs 1 through 49 of this Complaint as set forth herein.

51.    Bowater received the benefit of TLG's transactional financial advisory services in connection with the Bowater/Abitibi merger.

52.    By industry custom, when defined services, such as the transactional financial advisory services requested by Bowater and rendered by TLG, result in a transaction, the result is the payment of a transaction fee reflecting the value of services provided.

53.    Bowater has been unjustly enriched by obtaining the benefit of TLG's services without paying TLG for their fair value.

WHEREFORE, TLG demands judgment against Bowater:

a.    for damages in an amount to be determined at trial and in no event less than $70 million;

b.    for pre-judgment and post-judgment interest, costs, fees and other expenses associated with this action, including reasonable attorneys' fees; and

c.    for such other legal or equitable relief as this Court deems just and proper.

Dated: New York, New York
       June 18, 2007

DECHERT LLP

By: _____
    Guy Petrillo
    Neil A. Steiner
    Joshua I. Sherman
30 Rockefeller Plaza
New York, New York  10112
(212) 698-3500

*Counsel for Plaintiff The Levin Group, L.P.*